## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ALFRED BOURGEOIS
Reg No. 98911-079
U.S. Penitentiary Terre Haute
Terre Haute, IN 47802                           Case Number: _____

     Plaintiff,

       v.

UNITED STATES DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001;

ERIC H. HOLDER, JR.
Attorney General
U.S. Department of Justice,
950 Pennsylvania Avenue, NW
Washington, DC 20530;

MICHELE LEONHART, Administrator
Drug Enforcement Administration
2401 Jefferson Davis Highway
Alexandria, VA 22301;

CHARLES E. SAMUELS, JR., Director
Federal Bureau of Prisons
U.S. Department of Justice
320 First St., NW
Washington, DC 20534;

PAUL M. LAIRD, Regional Director
Federal Bureau of Prisons, North Central Region
U.S. Department of Justice
400 State Avenue, Suite 800
Kansas City, KS 66101;

KERRY J. FORESTAL
United States Marshal, Southern District of Indiana
U.S. Courthouse
46 E. Ohio Street, Room 179
Indianapolis, IN 46204;

NEWTON E. KENDIG, II., M.D.
Medical Director, Health Services Division
Federal Bureau of Prisons
320 First St., NW
Washington, DC 20534;

CHARLES L. LOCKETT, Warden
U.S. Penitentiary Terre Haute
4700 Bureau Road South
Terre Haute, IN 47802;

THOMAS WEBSTER, M.D.
Clinical Director
U.S. Penitentiary Terre Haute
4700 Bureau Road South
Terre Haute, IN 47802; and

JOHN DOES I-X,

    Defendants.
    In their official capacities.

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF THE FIFTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 551 *et seq.*

### I.
### Nature of Action

1.  This is a civil action for declaratory and injunctive relief brought by Plaintiff

Plaintiff Alfred Bourgeois for (i) violations and threatened violations of his right to due process

under the Fifth Amendment to the United States Constitution; and (ii) violations and threatened

violations of his right to be free from cruel and unusual punishment under the Eighth

Amendment to the United States Constitution; and (iii) violations and threatened violations of his

rights pursuant to the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA").

2.  Plaintiff has been sentenced to death under federal law.  Defendants are the

individuals charged by the federal government with carrying out the judgment of sentence of death.  Unless Plaintiff's death sentence is overturned in another judicial proceeding or via executive clemency, he will be executed by Defendants pursuant to a lethal injection method and protocol that violates the Fifth and Eighth Amendments and the APA.  Plaintiff seeks a preliminary and permanent injunction preventing Defendants from executing him pursuant to those procedures, an Order declaring that Defendants' lethal injection method and protocol, and the procedures for the development thereof, violate the Fifth and Eighth Amendments and the APA, and such other equitable relief as this Court deems just and proper.

3.    The Fifth Amendment's Due Process clause requires notice and the opportunity to be heard before the deprivation of life, liberty, or property.  Defendants, however, refuse to disclose the procedures they will utilize in carrying out Plaintiff's execution, thereby preventing Plaintiff from specifying all of the aspects in which those procedures constitute cruel and unusual punishment, and preventing Plaintiff from consulting medical experts concerning those violations, in violation of the Due Process Clause.

4.    It is a violation of the Eighth Amendment to use a method of execution that presents a "substantial risk of serious harm." *Baze v. Rees*, 553 U.S. 35, 50 (2008). *See also Furman v. Georgia*, 408 U.S. 238, 273 (1972); *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (plurality opinion) (holding Eighth Amendment prohibits the "unnecessary and wanton infliction of pain").  On information and belief, the means by which Defendants plan to execute Plaintiff present a substantial risk of serious harm.

5.    Plaintiff was sentenced to death pursuant to the Federal Death Penalty Act (FDPA), 18 U.S.C. 3591 *et seq.*, which authorizes a sentence of death in certain circumstances.  The FDPA, however, neither specifies nor authorizes any of the Defendants to determine the

3

method by which a sentence of death may be carried out.  Nevertheless, Defendants have promulgated regulations which purport to authorize that a sentence of death be carried out by the intravenous injection of lethal chemicals.  Since they were not statutorily authorized, those regulations are *ultra vires* and must be set aside pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 706(c)(2).  Moreover, they were promulgated in violation of the APA's procedural requirements, and are arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

6.      In the Controlled Substance Act (CSA), Congress established a federal scheme that comprehensively regulates the manufacture, distribution, possession and dispensation of "controlled substances."  The CSA makes it unlawful to "dispense" any controlled substance except pursuant to the prescription of a practitioner possessing a registration issued pursuant to the CSA.  21 U.S.C. §§ 822, 829 (2000).  To be effective, such a prescription "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a) (2005).

7.      Upon information and belief, Defendants intend to execute Plaintiff by administering a controlled substance – sodium thiopental – in violation of the CSA; *i.e.*, by dispensing that controlled substance not pursuant to a prescription issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice and possessing a valid registration issued pursuant to the CSA.  In doing so, the defendants have arbitrarily and capriciously failed to exercise their authority to enforce the CSA.

8.      The claims in this complaint are cognizable under the Fifth and Eighth Amendments as well as the APA. This lawsuit is not, and should not be treated as, a successor habeas corpus petition. *See Nelson v. Campbell*, 541 U.S. 637 (2004).  In this action, Plaintiff

4

does not challenge the validity of his convictions or death sentence.  Rather, he claims that the means by which Defendants plan to kill him violate the Fifth and Eighth Amendments and the APA.

9.      Plaintiff does not seek relief herein as a means of attacking his underlying convictions or death sentence; rather than seeking to stop his execution *per se*, he seeks to stop Defendants from executing him in a manner that violates his constitutional and statutory rights. If Defendants implement execution procedures that do not violate Plaintiff's constitutional rights, then Defendants will be entitled to execute Plaintiff, barring relief granted through some other judicial or clemency proceeding.

## II.
## Parties

10.     Plaintiff Alfred Bourgeois is a United States citizen and a resident of the State of Louisiana.  He is a death-sentenced inmate in the custody of Defendants and under the control and supervision of the Federal Bureau of Prisons ("BOP"), a department of the United States Department of Justice.  He is incarcerated at the United States Penitentiary in Terre Haute, Indiana ("USP Terre Haute").  If his capital conviction and/or death sentence are not overturned in another judicial proceeding or through executive clemency, Defendants will kill him in the "death house" located on the grounds of USP Terre Haute, which is operated and controlled by Defendants.

11.     Defendant United States Department of Justice is the parent agency of the BOP, employs the BOP Defendants, and is the agency that intends to execute Plaintiff by means of lethal injection.

12.     Defendant Eric H. Holder, Jr., is the Attorney General of the United States.

5

Plaintiff was remanded into the Attorney General's custody upon his conviction and the imposition of his death sentence. The Attorney General prescribes the means for implementing federal judicial death sentences. He is the final executive authority responsible for carrying out sentences of death against federal prisoners. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

13.     Defendant Michele Leonhart is the Administrator of the United States Drug Enforcement Agency ["DEA"]. In that role, she is responsible for exercising the authority delegated to her by the Attorney General to enforce the CSA. She is sued here in her official capacity for the purpose of obtaining declaratory and injunctive relief.

14.     Defendant Charles E. Samuels, Jr., is the Director of the BOP. As such, he is charged with prescribing and directing, and is authorized to prescribe and direct, the promulgation of rules and regulations for the BOP, including the rules and regulations for the conduct of prison operations and execution procedures. He has the discretion to determine procedures regarding the administration of the substances used in the lethal injection procedures and the qualifications of the persons who administer those substances. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

15.     Defendant Paul M. Laird is the Regional Director of the North Central Region of the BOP. As such, he has responsibility for USP Terre Haute, and plays a critical role in the promulgation of rules and regulations for the BOP, including the rules and regulations for the conduct of prison operations and execution procedures. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

16.     Defendant Kerry J. Forestal is the United States Marshal for the Southern District of Indiana. In that position he directs the personnel who administer the lethal substance(s) during

executions. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

17.     Defendant Newton E. Kendig, II, M.D., is the Medical Director of BOP. In that position he is responsible for overseeing the provision of medical care to inmates at all BOP facilities, and for promulgating and implementing BOP policy with respect to medical care provided by BOP. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

18.     Defendant Charles L. Lockett is the Warden of USP Terre Haute, which is the prison where Plaintiff is confided and at which sentences of death are carried out within the BOP. In that position, he is charged with management of USP Terre Haute and the oversight and conduct of operations there, including the oversight and conduct of executions carried out there. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

19.     Defendant Thomas Webster, M.D. is the Clinical Director at USP Terre Haute. In that position he is responsible for overseeing the provision of medical care to inmates at that facility. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

20.     John Does I - X are employed by BOP to consult with, prepare for and/or carry out Plaintiff's execution. Plaintiff does not know, and Defendants have not revealed, their identities. They are sued here in their official capacities for the purpose of obtaining declaratory and injunctive relief.

21.     Defendants are acting, and each of them at all times relevant hereto were acting, in their respective official capacities with respect to all acts described herein, and were in each

instance acting under the color and authority of federal law.  Upon information and belief, unless

preliminarily and permanently enjoined, each of the Defendants intends to act in his or her

official capacity and under the authority of federal law in executing Plaintiff, in violation of

Plaintiff's constitutional and statutory rights.

### III.
### Jurisdiction and Venue

22.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, in that it

arises under the Constitution and laws of the United States, that it seeks to secure prospective,

equitable relief directly under the Constitution, specifically the Fifth and Eighth Amendments;

under 28 U.S.C. § 2201(a), in that one purpose of this action is to secure declaratory relief; and

under 28 U.S.C. § 2202, in that one purpose of this action is to secure preliminary and permanent

injunctive relief.  Judicial review of the agency action at issue is authorized by the APA, 5 U.S.C.

§§ 702, 704 and 706.

23.     This Court has venue under 28 U.S.C. § 1391(b)(2), because the BOP

headquarters is in this District and a substantial part of the events giving rise to the claims made

herein – *i.e.*, the formulation of the BOP's procedures governing the execution of condemned

inmates – took place and continue to take place in this District.

### IV.
### Facts

24.     The claims and factual allegations set forth in all other sections of this Complaint

are realleged as if set forth entirely herein.

25.     Plaintiff was convicted of murder and sentenced to death in March 2004 in the

United States District Court for the Southern District of Texas.  On August 25, 2005, his

conviction was affirmed on direct appeal.  A timely Petition for a Writ of Certiorari was filed in

the United States Supreme Court on January 9, 2006. Certiorari was denied on May 15, 2006.

Bourgeois v. United States, 126 S.Ct. 2020 (2006).

26.     On May 14, 2007, Plaintiff filed a Motion for Relief Pursuant to 28 U.S.C. §

2255. The United States District Court for the Southern District of Texas denied the Motion on

May 19, 2011, and denied a certificate of appealability. On February 27, 2012, Plaintiff filed a

Motion for Certificate of Appealability with the Fifth Circuit Court of Appeals. That Motion is

currently pending before the Circuit Court.

A.     **The Lethal Injection Regulations, Methods, and Protocol**

27.     Plaintiff was sentenced to death pursuant to the Federal Death Penalty Act

(FDPA), 18 U.S.C. 3591 *et seq.*, which authorizes the imposition of a death sentence in certain

circumstances. The FDPA does not, however, specify the means by which an individual

sentenced to death under the statute is to be executed, nor does it authorize any agency to make

that determination, or to promulgate any regulations implementing the death sentence authorized

by the Controlled Substance Act.

28.     Nevertheless, on November 30, 1992, the Department of Justice ("DOJ")

published a proposed rule purporting to "establish[] procedures" for carrying out a death sentence

imposed under 21 U.S.C. § 848(1). 57 Fed. Reg. 56536 (1992). In response, DOJ received

twenty-three comments concerning the proposed rule from medical associations and physicians,

criminal defense attorneys, advocates for prisoners' rights and the media, and private citizens.

29.     Defendants rejected these comments and issued a Final Rule that purportedly took

effect on February 18, 1993. 58 Fed. Reg. 4898 (1993) (the "Final Rule"). The Final Rule stated

merely that "a sentence of death shall be executed ... by intravenous injection of a lethal

substance or substances in a quantity sufficient to cause death, such substance or substances to be

9

determined by the Director of the Federal Bureau of Prisons and to be administered by qualified personnel selected by the Warden and acting at the direction of the Marshal." 28 C.F.R. § 26.3(a)(4). The regulations adopted by Defendants do not specify what lethal substances shall be used to kill condemned inmates, the method of delivery, what amount of such substances shall be used, in what order such substances shall be administered, or by whom they shall be administered.

30.    However, on one or more occasions since February 18, 1993, Defendants have adopted further regulations specifying in detail the means and method by which executions by lethal injection are to be carried out ("the Lethal Injection Protocol").

31.    Defendants have not disclosed their most recent Lethal Injection Protocol, to the extent that one exists, to Plaintiff, nor have they made public all material and relevant details surrounding the process by which they adopted their most recent Lethal Injection Protocol.

32.    Upon information and belief, Defendants and/or their agents simply adopted lethal injection protocols used by one or more states, without providing public notice and opportunity for comment, and without investing meaningful and independent efforts designed to ensure that their Lethal Injection Protocol complies with contemporary medical standards and long-standing constitutional standards, including evolving standards of decency, that forbid the infliction of excruciating, cruel, and unusual pain and punishment.

B.    **Lethal Injection**

1.    **The Chemicals Used in the Lethal Injection Protocol**

33.    Upon information and belief, to the extent that Defendants intend to use their most recent Lethal Injection Protocol, Defendants intend to execute Plaintiff using sodium thiopental, pancuronium bromide, and potassium chloride. This combination of drugs causes

death by suffocation and heart attack, which are extraordinarily and excruciatingly painful.

34.    While the administration of sodium thiopental is intended to render Plaintiff insensible to the pain of his death, upon information and belief, the Lethal Injection Protocol creates a substantial risk that it will not do so, and that the administration of pancuronium bromide will merely cast a "chemical veil" over the excruciating pain experienced by Plaintiff, leaving him conscious but trapped in a paralyzed body wracked with the pain of suffocation by oxygen starvation, and by the resulting heart attack, while making it impossible for those observing the execution – including witnesses and Defendants, who are charged with actually carrying out and monitoring the execution – to recognize and prevent the gratuitous pain and suffering being inflicted upon Plaintiff.

35.    Sodium thiopental is an ultra short-acting barbiturate with a very short shelf life in liquid form. It is distributed in powder form to increase its shelf life, and must be mixed into a liquid solution by trained personal before it can be injected.

36.    When anesthesiologists use sodium thiopental, they do so for the purpose of temporarily anesthetizing patients in order to permit sufficient time to intubate the trachea and institute mechanical support of ventilation and respiration.  Once this has been achieved, additional drugs are administered to maintain a "surgical depth" or "surgical plane" of anesthesia (i.e., a level of anesthesia deep enough to ensure that a surgical patient feels no pain and is unconscious for the duration of the surgical procedure).

37.    The medical utility of sodium thiopental derives from its ultra short-acting properties: if unanticipated obstacles hinder or prevent successful intubation, patients will quickly regain consciousness and will resume ventilation and respiration on their own.

38.    These benefits of sodium thiopental in the operating room engender serious risks

in the execution chamber.  Upon information and belief, the dose of sodium thiopental used in the execution procedure is administered in a single injection from a single syringe.

39.     Upon information and belief, by contrast, the original design of the Lethal Injection Protocol called for the continuous intravenous administration of an ultra short-acting barbiturate.  The continuous administration of the ultra short-acting barbiturate is essential to ensure continued and sustained anaesthesia during the administration of pancuronium bromide and potassium chloride.

40.     The failure to administer a continuous infusion of an ultra short-acting barbiturate creates a substantial but completely avoidable and unnecessary risk of serious harm: that the condemned inmate will consciously experience muscular paralysis, without loss of consciousness or sensation, during the excruciating pain of both suffocation and the intravenous injection of potassium chloride. This substantial risk is present in the most recent Lethal Injection Protocol because the sedative effect of sodium thiopental can be neutralized by the second chemical to be used: pancuronium bromide.

41.     Sensitivity to sodium thiopental varies greatly among individuals.  The necessary dosage needed for effective use of sodium thiopental is susceptible to a number of factors, including body weight, body fat, prior drug usage, the presence in the body of other sedating agents (which may be provided to condemned inmates in the period immediately before their execution), and the level of anxiety or stress the inmate is experiencing.

42.     The variable sensitivity and the range of known and unknown factors that influence the effectiveness of sodium thiopental make it imperative that the drug be administered by qualified individuals in order to ensure that it brings about a deep, lengthy anesthetized state in a condemned individual and prevents the infliction of unnecessary pain.

12

43.     Unless it is administered by a qualified individual, the condemned person may lose consciousness for only a brief period, leaving him sensible to the horrific pain resulting from the administration of potassium chloride but unable to communicate that pain to those administering the lethal injection because of the paralyzing effect of pancuronium bromide.

44.     On information and belief, the Lethal Injection Protocol does not call for sodium thiopental to be administered by a person qualified to administer it.

45.     Sodium thiopental is a Schedule III controlled substance under the CSA. Schedule III drugs have an abuse potential which is slightly less than those drugs which possess a severe psychological or physical dependence liability; have an accepted medical use in the United States; and, are available for practitioners to prescribe, dispense and administer. *See generally,* 28 U.S.C. § 1308.13.

46.     Sodium thiopental is no longer domestically available, and foreign-produced sodium thiopental has not been approved by the United States Food and Drug Administration (FDA). Therefore, upon information and belief, Defendants either will use a different barbiturate in place of sodium thiopental or they will acquire and use sodium thiopental that is not FDA-approved. Defendants' use of non-FDA-approved sodium thiopental would violate the federal Food Drug and Cosmetic Act and would create a substantial risk of serious harm to Plaintiff.

47.     Upon information and belief, the second chemical involved in the most recent Lethal Injection Protocol, pancuronium bromide (or pavulon) is a derivative of the plant extract curare that acts as a neuromuscular blocking agent. Pancuronium bromide paralyzes all skeletal muscles, including the diaphragm, causing the inmate to be unable to move or breathe.

48.     While pancuronium bromide causes muscular paralysis, it does not affect sensation, consciousness, cognition, or the ability to feel or perceive pain and suffocation.

49.     If the sodium thiopental (or other barbiturate) is given in doses sufficient to cause death, then there is no rational or medically justifiable place in the Lethal Injection Protocol for pancuronium bromide.  It is not necessary to cause death, and its function in the Lethal Injection Protocol is solely cosmetic or aesthetic.

50.     By preventing the prisoner's muscles from moving and indicating pain or suffering, pancuronium bromide makes the prisoner appear serene.  However, pancuronium bromide can neutralize the sedating effect of the sodium thiopental (or other barbiturate), and to the extent it does, or to the extent that insufficient barbiturate is administered, pancuronium bromide masks the excruciating pain suffered by the inmate as he suffocates by oxygen starvation and endures cardiac arrest.

51.     If, during his execution, an unconscious condemned inmate is paralyzed after being administered pancuronium bromide and then regains consciousness, it is almost a certainty that the execution staff, including any attending physician or medical personnel, would be completely unaware that he had become conscious.

52.     An inmate could regain consciousness in those circumstances because (1) less than the necessary dose of sodium thiopental (or other barbiturate) had been successfully injected into the individual's bloodstream, (2) the sensitivity to sodium thiopental (or other barbiturate) varies greatly among the population, and some individuals – particularly those who have been building additional resistance by taking Valium or other anti-anxiety medication – are significantly more resistant to sodium thiopental than others, or (3) the duration of the effectiveness of the ultra short-acting barbiturate has worn off by the time the next drug is administered.  In such a scenario, the execution staff, including any attending physician or medical personnel and witnesses, would be completely unaware that the condemned person was

experiencing excruciating pain from suffocation, burning in the veins from the injection of the potassium chloride, and finally a myocardial infarction induced by the potassium chloride.

53.     The signs and symptoms that indicate how deeply a patient is anesthetized are visibly subtle.

54.     Upon information and belief, the Lethal Injection Protocol does not provide for the presence in the execution chamber of staff with the training, experience, or expertise to assess these signs and symptoms, or for the presence in the execution chamber of any equipment capable of determining whether a prisoner to whom pancuronium bromide has been administered is, in fact, unconscious.

55.     At one time, it was considered acceptable for veterinarians to euthanize household pets such as dogs and cats using a combination of a sedative such as sodium thiopental and a muscular blocking agent such as pancuronium bromide.  However, this practice is now banned by numerous state statutes, and by veterinary guidelines in this and other countries for precisely the reasons outlined above.

56.     Just as it fails to comport with the evolving "standard of decency" regarding the euthanizing of household pets, this practice violates contemporary standards of decency designed to prevent the infliction of unnecessary, excruciating pain and suffering on human beings.

57.     Upon information and belief, the third and final chemical to be administered pursuant to the most recent Lethal Injection Protocol is potassium chloride.  This chemical induces cardiac arrest in the inmate by activating the nerve fibers lining the inmate's veins and interfering with the rhythmic contractions of the heart.

58.     The perception or experience of potassium chloride is extraordinarily painful. Upon information and belief, Defendants have chosen to induce cardiac arrest despite the

availability of other chemicals which accomplish the same purpose while inflicting substantially

less or no pain.

59.    On at least ten occasions since 1977, inmates executed by means of lethal

injection similar or identical to the Lethal Injection Protocol at issue here have suffered violent

and painful reactions to the chemicals administered during the execution:

    a.    On December 13, 1988, in Texas, Raymond Landry was pronounced dead 40 minutes after being strapped to the execution gurney and 24 minutes after the drugs first started flowing into his arms. Two minutes after the drugs were administered, the syringe came out of Landry's vein, spraying the deadly chemicals across the room toward witnesses. The curtain separating the witnesses from the inmate was then pulled, and not reopened for fourteen minutes while the execution team reinserted the catheter into the vein. Witnesses reported "at least one groan."

    b.    On May 24, 1989, in Texas, Stephen McCoy had such a violent physical reaction to the drugs (heaving chest, gasping, choking, back arching off the gurney, etc.) that a male witness fainted, crashing into and knocking over another witness.

    c.    On September 12, 1990, in Illinois, Charles Walker suffered excruciating pain during his execution because of equipment failure and human error. According to an engineer from the Missouri State Prison retained by the State of Illinois to assist with Walker's execution, a kink in the plastic tubing going into Walker's arm stopped the deadly chemicals from reaching Walker. In addition, the intravenous needle was inserted pointing at Walker's fingers instead of his heart, prolonging the execution.

    d.    On March 10, 1992, in Oklahoma, Robyn Lee Parks had a violent reaction to the drugs used in his execution. Two minutes after the drugs were dispensed, the muscles in his jaw, neck, and abdomen began to react spasmodically for approximately 45 seconds. Parks continued to gasp and violently gag until death came, eleven minutes after the drugs were first administered. A Tulsa World reporter wrote that the execution looked "painful and ugly," and

"scary."

e.   According to an Associated Press reporter, on May 7, 1992, in Texas, Justin Lee May "went into a coughing spasm, groaned and gasped, lifted his head from the death chamber gurney and would have arched his back if he had not been belted down. After he stopped breathing, his eyes and mouth remained open."

f.   On May 10, 1994, in Illinois, after the execution of John Wayne Gacy began, the lethal chemicals unexpectedly solidified, clogging the IV tube that lead into Gacy's arm, and prohibiting any further passage. Blinds covering the window through which witnesses observed the execution were drawn, and the execution team replaced the clogged tube with a new one. Ten minutes later, the blinds were reopened and the execution process resumed. It took 18 minutes to complete. Anesthesiologists blamed the problem on the inexperience of prison officials who were conducting the execution, saying that proper procedures taught in "IV 101" would have prevented the error.

g.   On May 3, 1995, in Missouri, seven minutes after the lethal chemicals began to flow into Emmit Foster's arm, the execution was halted when the chemicals stopped circulating. With Foster gasping and convulsing, the blinds were drawn so the witnesses could not view the scene. Death was pronounced thirty minutes after the execution began, and three minutes later the blinds were reopened so the witnesses could view the corpse. According to the Washington County Coroner who pronounced death, the problem was caused by the tightness of the leather straps that bound Foster to the execution gurney; they were so tight that the flow of chemicals into the veins was restricted.  Foster did not die until several minutes after a prison worker finally loosened the straps.

h.   On May 8, 1997, in Oklahoma, Scott Dawn Carpenter was pronounced dead 11 minutes after the lethal injection was administered. As the drugs took effect, Carpenter began to gasp and shake. This was followed by a guttural sound, multiple spasms and gasping for air, until his body stopped moving three minutes later.

i.   On April 23, 1998, in Texas, it took two attempts to

17

complete the execution of Joseph Cannon. After Cannon
made his final statement, the execution process began.
A vein in Cannon's arm collapsed and the needle popped
out. Seeing this, Cannon lay back, closed his eyes, and
exclaimed to the witnesses, "It's come undone." Officials
then pulled a curtain to block the view of the witnesses,
reopening it fifteen minutes later when a weeping Cannon
made a second final statement and the execution process
resumed.

j.      On June 28, 2000, in Missouri, Bert Leroy Hunter
repeatedly coughed and gasped for air after the lethal
chemicals were injected and before he lapsed into
unconsciousness. A witness reported that Hunter had
"violent convulsions. His head and chest jerked rapidly
upward as far as the gurney restraints would allow, and then
he fell quickly down upon the gurney. His body convulsed
back and forth .. repeatedly.... He suffered a violent and
agonizing death."

k.      On December 13, 2006, in Florida, Angel Diaz continued
to move after the first injection was administered, and was
squinting and grimacing as he tried to mouth words. A
second dose was then administered, and 34 minutes passed
before Mr. Diaz was declared dead.  After performing an
autopsy, the Medical Examiner, Dr. William Hamilton,
stated that Mr. Diaz's liver was undamaged, but that the
needle had gone through Mr. Diaz's vein and out the other
side, so the deadly chemicals were injected into soft tissue,
rather than the vein.

Michael L. Radelet, *Some Examples of Post-Furman Botched Executions*, May 24, 2007,

available at http://www.deathpenaltyinfo.org/article.php?scid=8&did=478.

60.      In addition, during numerous executions, difficulties in locating veins suitable for

intravenous lethal injection have resulted in significant delays and other torment of condemned

prisoners:

a.      March 13, 1985, Texas.  Because of Stephen Peter Morin's
history of drug abuse, the execution technicians were forced
to probe both of Morin's arms and one of his legs with
needles for nearly 45 minutes before they found a suitable

18

vein.

b.  August 20, 1986, Texas.  Randy Woolls, a drug addict, was required to help the execution technicians find a useable vein for the execution.

c.  June 24, 1987, Texas.  Because of collapsed veins, it took nearly an hour to complete the execution of Elliot Rod Johnson.

d.  January 24, 1992, Arkansas.  It took medical staff more than 50 minutes to find a suitable vein in Rickey Ray Rector's arm. Witnesses were kept behind a drawn curtain and not permitted to view this scene, but reported hearing Rector's eight loud moans throughout the process. During the ordeal Rector (who suffered from serious brain damage) helped the medical personnel find a vein.

e.  April 23, 1992, Texas.  Billy Wayne White was pronounced dead 47 minutes after being strapped to the execution gurney. The delay was caused by difficulty finding a vein. White had a long history of heroin abuse. During the execution, White attempted to assist the authorities in finding a suitable vein.

f.  January 23, 1996, Virginia.  The execution of Richard Townes, Jr. was delayed for 22 minutes while medical personnel struggled to find a vein large enough for the needle. After unsuccessful attempts to insert the needle through the arms, the needle was finally inserted through the top of Mr. Townes' right foot.

g.  July 18, 1996, Indiana.  Because of unusually small veins, it took one hour and nine minutes for Tommie J. Smith to be pronounced dead after the execution team began sticking needles into his body. For sixteen minutes, the execution team failed to find adequate veins, and then a physician was called. Smith was given a local anesthetic. and the physician twice attempted to insert the tube in Smith's neck. When that failed, an angio-catheter was inserted in Smith's foot. Only then were witnesses permitted to view the process. The lethal drugs were finally injected into Smith 49 minutes after the first attempts, and it took another 20 minutes before death was pronounced.

19

h. June 13, 1997, South Carolina.  Because Michael Eugene Elkins's body had become swollen from liver and spleen problems, it took nearly an hour to find a suitable vein for the insertion of the catheter. Elkins tried to assist the executioners, asking, "Should I lean my head down a little bit?" as they probed for a vein. After numerous failures, a usable vein was finally found in Elkins's neck.

I. August 26, 1998, Texas.  The execution of Genaro Ruiz Camacho was delayed approximately two hours due, in part, to problems finding suitable veins in Camacho's arms.

j. October 5, 1998, Nevada.  It took 25 minutes for the execution team to find a vein suitable for the lethal injection of Roderick Abeyta.

k. May 3, 2000, Arkansas.  Christina Marie Riggs' execution was delayed for 18 minutes when prison staff couldn't find a suitable vein in her elbows. Finally, Riggs agreed to the executioners' requests to have the needles in her wrists.

l. June 8, 2000, Florida.  It took execution technicians 33 minutes to find suitable veins for the execution of Bennie Demps.  "They butchered me back there," said Demps in his final statement. "I was in a lot of pain. They cut me in the groin; they cut me in the leg. I was bleeding profusely. This is not an execution, it is murder." The executioners had no unusual problems finding one vein, but because Florida protocol requires a second alternate intravenous drip, they continued to work to insert another needle, finally abandoning the effort after their prolonged failures.

m. December 7, 2000, Texas.  The execution of Claude Jones, a former intravenous drug abuser, was delayed 30 minutes while the executioners struggled to insert an IV into a vein. One member of the execution team commented, "They had to stick him about five times. They finally put it in his leg."

n. November 7, 2001, Georgia.  Jose High was pronounced dead more than one hour after his execution began. After attempting to find a useable vein for 39 minutes, the emergency medical technicians under contract to do the execution abandoned their efforts. Eventually, one needle was stuck in High's hand, and a physician was called in

to insert a second needle between his shoulder and neck.

o.     May 24, 2007, Ohio.  Christopher Newton. According to the Associated Press, "prison medical staff" at the Southern Ohio Correctional Facility struggled to find veins on each of Newton's arms during the execution. Newton, who weighted 265 pounds, was declared dead almost two hours after the execution process began. The execution team stuck Newton at least ten times with needles before getting the shunts in place where the needles are injected.

p.     June 26, 2007, Georgia.  John Hightower took approximately 40 minutes for the nurses to find a suitable vein to administer the lethal chemicals, and death was not pronounced until almost an hour after the execution process began.

q.     September 15, 2009, Ohio.  Romell Broom.  After two hours of searching for suitable veins to insert the needles for lethal injection, the execution team was unable to complete the process and the execution was called off. Since then, stays have been granted by courts considering whether it would be constitutional to attempt Broom's execution a second time.

**B.    The Prospective Revisions to the Lethal Injection Protocol**

61.    Upon information and belief, Defendants have been unable to secure certain chemicals called for in the most recent Lethal Injection Protocol.

62.    Defendants have disclosed that they have been unable to obtain sodium thiopental.

63.    Upon information and belief, Defendants are in the process of revising certain aspects of the most recent Lethal Injection Protocol, which will result in a Revised Protocol.

64.    To the extent that Defendants intend to use a Revised  Protocol to execute Plaintiff, Defendants have failed to provide notice of the specific protocol and procedures they intend to use to carry out Plaintiff's execution.

**2.    Lethal Injection Protocol, Personnel and Processes**

65.    The preparation of drugs, particularly for intravenous use, is a technical task requiring significant training in pharmaceutical concepts and calculations. There are many risks associated with drug preparation that, if not properly addressed by properly credentialed and trained personnel, further elevate the risk that an inmate will consciously experience excruciating pain during lethal injection.

66.    The correct and safe management of intravenous drug and fluid administration requires a significant level of professional acumen, and cannot be performed adequately by personnel lacking the requisite training and experience.

67.    The great majority of nurses are not trained in the use of ultra short-acting barbiturates; indeed, this class of drugs is normally used only by nurses who have significant experience in intensive care units and as nurse anesthetists. Very few other medical personnel, such as paramedics or phlebotomists, are trained or experienced in the use of ultra short-acting barbiturates.

68.    The risk of inflicting severe and unnecessary pain and suffering upon Plaintiff in the most recent Lethal Injection Protocol is particularly grave because, upon information and belief, the procedures and protocols designed by Defendants do not include safeguards regarding the manner in which the execution is to be carried out, do not establish the minimum qualifications and expertise required of the personnel performing critical tasks in the Lethal Injection Protocol, and do not establish appropriate criteria and standards that these personnel must meet in carrying out the Lethal Injection Protocol.

69.    Upon information and belief, the Lethal Injection Protocol does not call for available medical equipment which could alert Defendants that the sodium thiopental (or other barbiturate) has failed or is no longer effective but the pancuronium bromide has taken effect,

leaving the condemned prisoner conscious but experiencing extreme pain.

70.     The Lethal Injection Protocol violates Plaintiff's constitutional rights by reason of

the absence of procedures for the use of medical monitoring equipment and other such necessary

procedures and properly-trained execution personnel to respond appropriately to the information

revealed by such medical equipment.

71.     Upon information and belief, the most recent Lethal Injection Protocol fails to

address additional factors necessary to ensure compliance with constitutional requirements,

including but not limited to, the following factors:

       a.      the methods for obtaining, storing, mixing, and
appropriately labeling the drugs, the chain of custody
for the lethal substances, the minimum qualifications and
expertise required for the person who will be determining
the concentration and dosage of each drug to give, and
the criteria that shall be used in exercising this discretion;

       b.      the consideration of individualized factors, including body
weight and individual sensitivity to or tolerance for the
chemicals used in the Lethal Injection Protocol, that affect
the appropriate dosage of each of the chemicals to be
administered;

       c.      the manner in which the intravenous tubing, three-way
valve, saline solution or other apparatus shall be modified
or repaired in the event it malfunctions during the execution
process, the minimum qualifications and expertise required
of the person who shall have the discretion to decide to
attempt such action, and the criteria that shall be used in
exercising this discretion;

       d.      the manner in which a monitoring system shall be installed
and utilized to ensure that Plaintiff is deeply sedated while
dying; and the qualifications and expertise required for the
person who operates this equipment;

       e.      the manner in which the intravenous catheters shall be
inserted into the condemned prisoner, the minimum
qualifications and expertise required for the person who is

given the responsibility and discretion to decide when efforts at inserting the intravenous catheters should be abandoned in favor of some other constitutionally acceptable procedure; and the manner in which the condition of the condemned prisoner will be monitored to confirm that proceeding to the next step of the Lethal Injection Protocol would not inflict severe and unnecessary pain and suffering upon Plaintiff;

    f.    the minimum qualifications and expertise required of the person who is given the responsibility and discretion to order the staff to divert from the established protocols if necessary to avoid inflicting severe and unnecessary pain and suffering upon Plaintiff, and the criteria to be used in exercising this discretion; and

    g.    the minimum qualifications and expertise required of the person who is given the responsibility and discretion to ensure that appropriate procedures are followed in response to unanticipated problems or events arising during the Lethal Injection Protocol, and the criteria that shall be used in exercising this discretion.

72.    Upon information and belief, although the most recent Lethal Injection Protocol calls for the dispensation and administration of chemicals which are controlled substances under the CSA, it allows those substances to be dispensed and administered without the prescription of a practitioner acting in the usual course of his professional practice and possessing a registration under the CSA.  21 U.S.C. §§ 822, 829 (2000); 21 C.F.R. §§ 1301.11; 1306.04(a) (2005).

**C.**    **Exhaustion of Remedies**

73.    Plaintiff commenced the process of exhausting his administrative remedies.  He has filed a Request for Informal Resolution with the staff at USP Terre Haute, thus complying with the initial step of the Administrative Remedy Procedure for Inmates, Bureau of Prisons Program Statement 1330.13.

74.    In his Request for Informal Resolution, Plaintiff challenged the method of

execution utilized by Defendants on the grounds that the lethal injection method and protocol, and the procedures for the development thereof, violate his Fifth Amendment rights to notice and to due process of law and his Eighth Amendment protections against cruel and unusual punishment and against deliberate indifference to serious medical needs.

75.     Plaintiff is awaiting a response to his Request for Informal Resolution.  If and when he receives an unfavorable response, he will file a formal Request for Administrative Remedy and appealed any unfavorable response thereto.  Plaintiff will exhaust all administrative remedies as they become available.

## V.
## Claims for Relief

### Count 1: Fifth Amendment Violation - Denial of Due Process

76.     The claims and factual allegations set forth in all other sections of this Complaint are realleged as if set forth entirely herein.

77.     The Due Process clause requires notice and the opportunity to be heard before the deprivation of life, liberty, or property.

78.     Defendants, acting under color of federal law, have refused to disclose the procedures that will be utilized in carrying out Plaintiff's execution, preventing the Plaintiff from determining all the aspects of the Lethal Injection Protocol that constitute cruel and unusual punishment and from consulting medical experts concerning those aspects, in violation of the Due Process Clause.

### Count 2: Fifth Amendment Violation - Denial of Due Process

79.     The claims and factual allegations set forth in all other sections of this Complaint are realleged as if set forth entirely herein.

80.    The Due Process clause requires notice and the opportunity to be heard before the deprivation of life, liberty, or property.

81.    Given the unavailability of domestic sodium thiopental, Defendants, acting under color of federal law, have refused to disclose what other ultra short-acting barbiturate will be utilized in carrying out Plaintiff's execution, in violation of the Due Process Clause.

### Count 3: Eighth Amendment Violation - Cruel and Unusual Punishment

82.    The claims and factual allegations set forth in all other sections of this Complaint are realleged as if set forth entirely herein.

83.    The Eighth Amendment forbids the government, in carrying out a death sentence, from inflicting pain beyond that necessary to end the condemned prisoner's life. *In re Kemmler*, 136 U.S. 436, 447 (1890). "Punishments are cruel when they involve torture or a lingering death . . . something more than the mere extinguishment of life." *Id.*

84.    Defendants, acting under color of federal law, intend to execute Plaintiff in a manner that is arbitrary, cruel, and/or unreliable, and which will inflict, or has a foreseeable and significant but completely avoidable and unnecessary risk of causing Plaintiff excruciating pain. Because it is foreseeable that the execution method will inflict unnecessary and savage pain upon Plaintiff, it violates Plaintiff's constitutional right to be free from arbitrary, capricious, cruel, and unusual punishment – rights secured and guaranteed to him by the Eighth Amendment of the United States Constitution.

### Count 4: Eighth Amendment Violation - Deliberate Indifference

85.    The claims and factual allegations set forth in all other sections of this Complaint are realleged as if set forth entirely herein.

86.    The Eighth Amendment forbids "deliberate indifference" to "serious medical

needs of prisoners," *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), and to a substantial risk

of serious harm to an inmate.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

87.    The BOP undertakes to provide inmates with medical care that is "presently

medically necessary," defined as treatment "without which an inmate could not be maintained ...

without significant pain or discomfort."  Federal Bureau of Prisons, U.S. Dep't of Justice,

Program Statement, No. 6000.04 (Dec. 15, 1994) ("Health Services Manual"), Ch. 1, § 1.

88.    The choice of a course of medical treatment violates the Eighth Amendment

where it is "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously

aggravate the prisoner's condition." *Thomas v. Pate*, 493 F.2d 151, 158 (7th Cir. 1974), *vacated*

*and remanded on other grounds sub nom., Cannon v. Thomas*, 419 U.S. 813 (1974).

89.    Defendants are required to provide Plaintiff with appropriate medical care until

the moment of his death.  Thus, the Eighth Amendment's proscription against "deliberate

indifference" requires that they administer the death penalty without the "unnecessary and

wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).

90.    However, the means chosen by Defendants to anesthetize Plaintiff to prevent him

from experiencing the excruciating pain associated with the lethal injection of potassium chloride

are "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously

aggravate the prisoner's condition."  Thus, the means that Defendants have chosen to purportedly

anesthetize Plaintiff prior to his execution violate Plaintiff's right, secured and guaranteed by the

Eighth Amendment of the United States Constitution, to be free from deliberate indifference to

serious medical needs.

### Count 5: Violation of Administrative Procedure Act -- Ultra Vires Agency Action

91.    The claims and factual allegations set forth in all other sections of this Complaint

are realleged as if set forth entirely herein.

92.    Under § 706(2)(c) of the Administrative Procedure Act, a reviewing court must

set aside any agency action that is "in excess of statutory jurisdiction, authority, or limitations

...." 5 U.S.C. § 706(2)(c) (2000).

93.    The regulations promulgated by the defendants to implement the death sentences

imposed upon the Plaintiff under 21 U.S.C. § 848(1), including both the final agency action

published at 58 Fed. Reg. 4898 (1993) and any and all Lethal Injection Protocols promulgated

by the defendants, were promulgated without any "statutory jurisdiction, authority, or

limitations," and must therefore be set aside.  5 U.S.C. § 706(2)(c).

### Count 6: Violation of Administrative Procedure Act Agency Action that Is Arbitrary, Capricious, An Abuse Of Discretion And Otherwise Not in Accordance with Law in Promulgating the Lethal Injection Regulations

94.    The claims and factual allegations set forth in all other sections of this Complaint

are realleged as if set forth entirely herein.

95.    The APA imposes upon Defendants a number of non-discretionary duties

regarding rule-making procedures.  5 U.S.C. § 553 (2000). The APA requires a federal agency

to provide adequate notice to the public regarding the nature, scope and effects of any proposed

or final agency action. The APA also requires that the federal agency provide the public with

a full and fair opportunity to comment regarding any proposed agency action.  Defendants failed

to provide adequate notice or opportunity for the public to comment on the Lethal Injection

Protocol prior to its promulgation.

96.    The APA also requires Defendants to consider and respond to any public

comments submitted, and where appropriate, revise the Final Rule accordingly.  Defendants

failed to respond adequately, or at all, to numerous public comments. Defendants also failed to correct deficiencies in the Final Rule that the comments identified.

97.     The APA also requires a federal agency to fully articulate its basis and reasons regarding any final agency action. Defendants have failed to explain adequately the basis and reason(s) for its decision to adopt lethal injection as the means of execution, or for the specific procedures adopted in the Lethal Injection Protocol.

98.     Defendants' past and ongoing failures to comply with the APA's procedural requirements are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. Therefore, in issuing the Proposed Rule, promulgating the Final Rule, and promulgating the various Lethal Injection Protocols, Defendants violated the APA, and their actions must be set aside.

### Count 7: Violation of Administrative Procedure Act – Arbitrary And Capricious Failure To Exercise Enforcement Authority Under The CSA

99.     The claims and factual allegations set forth in all other sections of this Complaint are realleged as if set forth entirely herein.

100.     The CSA makes it unlawful to "dispense" any "controlled substance" except pursuant to a prescription "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice" and who has obtained a registration pursuant to the statute. 21 U.S.C. §§ 822, 829, 841(a)(1) (2000).

101.     Sodium thiopental is a Schedule III controlled substance.

102.     Regulations promulgated by the Drug Enforcement Administration provide that every person who "dispenses" a "controlled substance" is required to obtain a "registration." 21 C.F.R. § 1301.11 (2005). The regulations also provide that the Administrator of the Drug

Enforcement Administration "shall deny" an application for registration unless the issuance

of a registration is "required" under the CSA.  21 C.F.R. § 1301.35 (2005).

103.    On information and belief, the most recent Lethal Injection Protocol calls for the

dispensing of sodium thiopental absent a valid prescription, by a person or persons who lack a

valid registration.  Moreover, on information and belief, Defendants have arbitrarily and

capriciously failed to exercise their authority to enforce the CSA, by not requiring the persons

whom the defendants intend to dispense controlled substances to Plaintiff to apply for a

registration, and will continue to act arbitrarily and capriciously by permitting them to dispense

a controlled substance without doing so.  Such arbitrary and capricious action violates the APA.

## XII.
### Prayer for Relief

104.    WHEREFORE, in order to prevent Defendants from violating Plaintiff's rights

under the Fifth and Eighth Amendments to the United States Constitution and the Administrative

Procedure Act, Plaintiff specifically requests that the Court enter a judgment

    a.    granting preliminary and permanent injunctive relief barring Defendants
          and all persons acting on their behalf and/or their agents and/or employees
          from executing Plaintiff by means of the most recent Lethal Injection
          Protocol or any Revised Protocol that violates Plaintiff's rights for the
          reasons challenged above.

    b.    granting a preliminary injunction barring Defendants from executing
          Plaintiff by means of the current Lethal Injection Protocol or any Revised
          Protocol that violates Plaintiff's rights for the reasons challenged above
          because:

      i.      there is a significant likelihood that Plaintiff will prevail on the merits;

      ii.     Plaintiff will suffer irreparable harm if he is executed pursuant to the Lethal Injection Protocol;

     iii.     there is a compelling public interest in ensuring that our government not behave like nations we roundly condemn for utilizing execution methods violative of our nation's constitutional proscription against cruel and unusual punishment; and

     iv.     there is a substantial possibility that others under a sentence of death will suffer unconstitutional executions unless this Court requires that defendants design and adopt constitutionally acceptable execution procedures.

c.     granting declaratory relief by issuing an Order declaring that Defendants' actions, practices, customs, and policies with regard to their means, methods, procedures, and customs regarding execution are illegal and violate the Fifth and Eighth Amendments to the United States Constitution and the Administrative Procedure Act.

d.     appointing a neutral Special Master to assist in fashioning remedies and to monitor the implementation of those remedies;

e.     Granting such further relief as it deems just and proper.

Dated:       May 15, 2012

Respectfully submitted,

LEIGH SKIPPER
Federal Public Defender

BILLY H. NOLAS (DC Bar No. 399275)
Chief Litigator
VICTOR J. ABREU
Supervisory Assistant Federal Defender
Federal Community Defender Office
        for the Eastern District of Pennsylvania
601 Walnut St, Suite 545W
Philadelphia, PA 19106
(215) 928-0520


*Counsel for Plaintiff Alfred Bourgeois*